COLLING, Adm., et al., Appellants,

v.

FRANKLIN COUNTY CHILDREN SERVICES et al., Appellees.

[Cite as *Colling v. Franklin Cty. Children Serv.* (1993), 89 Ohio App.3d 245.]

Court of Appeals of Ohio,
Franklin County.

No. 92AP–1579.

Decided June 29, 1993.

Luigia Tenuta, for appellants.

Michael Miller, Franklin County Prosecuting Attorney, Elizabeth A. Scott and Carol Hamilton O'Brien, Assistant Prosecuting Attorneys, for appellees.

PETREE, Judge.

Plaintiffs, Linda S. Colling, individually and as administrator of the estate of her deceased son, Mark E. Longstreth, David M. Longstreth, Sr., and the derivative heirs and next of kin of Mark E. Longstreth, appeal from the Franklin County Court of Common Pleas which granted summary judgment in this wrongful death action to defendants, Franklin County Children Services ("FCCS"), Franklin County Children Services Board, Franklin Village, Franklin County Commissioners, and Carol Hoversten–Pepper. Plaintiffs assert five assignments of error on appeal, as follows:

"I. The trial court erred in granting Children Services' worker Carol Hoversten–Pepper immunity under § 2744.03(A)(6)(b) of the Code when, given all reasonable inferences under Civ.R. 56(C), plaintiffs' evidence demonstrates the requisite recklessness to sustain a wrongful death claim against the governmental employee.

"II. The off-site outing conducted by Children Services could be characterized as a proprietary function. The trial court erred when it failed to consider the circumstances under § 2744.02(B)(2) of the Code as a basis to impose liability upon Children Services.

"III. By court order, Mark Longstreth was placed in Children Services' custody and protective residential care. The trial court erred in disregarding the duties and liabilities imposed upon the agency by this common law special relationship.

"IV. Mark Longstreth was endangered by Children Services. When reading Revised Code § 2125.01 and § 2744.02(B)(5), *in pari materia*, the law expressly imposes liability upon the agency for the child's resulting wrongful death.

"V. The sovereign immunity act may not be applied in a matter which denies decedent equal protection and due course of law."

The present appeal poses the question of whether a county children services agency can be held responsible for the drowning death of a juvenile in its custody at an agency-sponsored fishing trip. Though we disagree with the trial court that, pursuant to principles of sovereign immunity, the agency can never be held liable for agency-sponsored recreational activities, we nonetheless find that there are no genuine issues of material fact to be tried on the instant set of facts. Accordingly, we must affirm the judgment of the trial court.

The statement of facts set forth in plaintiffs' brief and accepted by defendants in their brief state the following undisputed pertinent facts. Mark E. Longstreth drowned during an FCCS fishing outing on July 22, 1989. At the time, Mark was subject to the custody and residential care of FCCS in accordance with a July 19,

1989 juvenile court dispositional order declaring him an unruly minor. Pursuant to that order, Mark was placed at a residential care facility known as the FCCS Transition Center, which serves as an emergency shelter and care facility and is operated as a "child residence center" under R.C. 5153.03, 5153.16, and Ohio Adm.Code Chapter 5101:2–9.

Carol Hoversten–Pepper is a social worker employed at the FCCS Transition Center as an activities therapist whose job duties include the planning and supervision of youth activities for children there. In the days preceding Mark Longstreth's death, Hoversten–Pepper planned a merit outing, involving fishing and swimming, for certain boys who had behaved well at the center during the previous week. These well-behaved boys were told that they were going to go to Alum Creek and perhaps to the beach there to swim. Mark Longstreth was one of those boys.

On the day of this outing, Hoversten–Pepper advised the on-site agency staff that the boys were going on a swimming and fishing trip to Alum Creek, but without advising anyone further, she changed the plans in the parking lot of the center because the agency van did not have enough gasoline to get the group to Alum Creek. Because of this, she instead took the boys to fish at the Greenlawn Dam, a closer area on the Scioto River.

When they arrived at the river there were no lifeguards in sight. Indeed, Hoversten–Pepper was not qualified in lifesaving or water safety. Moreover, signs were posted expressly prohibiting "swimming and wading" on the pathway taken by Hoversten–Pepper and the children. The children began the outing by fishing on the public dock on the north eastern bank of the dam, but in the afternoon they moved to the more remote western shore across the river. At this location, the river flows quickly and noisily over a spillway. The parties were spread across a bank, underneath a bridge, where there were echoes and muffling sounds from passing traffic. The day was hot and humid; some of the children changed to swimming trunks or cut-offs.

At this more remote location, one of the children waded knee-deep to fish. Then other children began wading as well. Hoversten–Pepper called them back as they got "too far out." But Mark Longstreth entered the water anyway. Unfortunately, he came across a hidden drop-off in the water. Consequently, he lost control, struggled and faltered, and he eventually drowned. Hoversten–Pepper did not try to rescue him because she was alone, had no lifesaving background, and could not leave the other children stranded. Further, she had not brought a life preserver, buoy or life jacket that day.

The Greenlawn Dam area is generally known as the site of previous drowning deaths. The on-site agency supervisor that day knew of such occurrences and the administrator of the center also had personal knowledge of the known

hazards of the site. There is no evidence that Hoversten–Pepper asked anyone about the suitability of the Greenlawn Dam area for purposes of the fishing outing.

Section 709.08 of the Columbus City Code prohibits swimming or bathing in a watercourse such as the Scioto River. Further, former Ohio Adm.Code 5101:2–9–51, which applied to children housed in residence centers, prohibited water activities at an unsafe area or where there was no lifeguard present.

Subsequent review of the drowning incident by FCCS revealed the following deficiencies: (1) no off-site recreation plan existed; (2) no agency safety policy was in place; (3) no plans for water-related activities existed; and (4) no general assessment tool was employed by the agency to ascertain the hazards or risks of given activities. The Institutional Abuse Summary also commented that children in these circumstances "tend to be rebellious, have impaired judgment and lack control."

Carol Hoversten–Pepper had no specific, clear standards for planning or acquiring approval of the off-site activities. The activity she undertook that day was not scheduled on a master calendar, nor subject to approval by any other person at the agency. Carol Hoversten–Pepper independently prepared activity plans by the guidelines of her "common sense" and "good judgment."

Performance evaluations of Carol Hoversten–Pepper reveal that in 1986 and 1987 she did not appear to be comfortable in some judgment calls, at times being too lenient and waiting until the boys actually got out of control. Indeed, Hoversten–Pepper knew that Mark Longstreth had trouble obeying authority figures. Moreover, Carol Hoversten–Pepper also knew from previous outings that Mark Longstreth was afraid of deep water and was a poor swimmer.

Given this evidence, the trial court held that plaintiffs could not recover from defendants for the wrongful death of Mark Longstreth because R.C. Chapter 2744 provided the political subdivision and its employee, Carol Hoversten–Pepper, with the protection of sovereign immunity. The court noted that when a "governmental function" is involved under R.C. 2744.02(A), neither an agency nor an employee of a political subdivision can be held liable for simple negligence. The court found that the fishing outing here was a governmental function because R.C. 2744.01(C)(2)(o) expressly provided that "the operation of a children's home" or agency was a governmental function. The court reasoned that since the provision of adequate recreational opportunities was mandated by statute for such homes and thus was an "integral part" of the operation of such a home, the fishing outing here was necessarily immune. Further, the court rejected plaintiffs' arguments that the common law or other sections of the Revised Code imposed liability on defendants in any event. Last, the court said that there was no genuine issue of material fact concerning recklessness in this case because

Carol Hoversten–Pepper was present at all times during this outing and Mark Longstreth was nearly seventeen years old when he went out into the water on his own and drowned.

■ Plaintiffs' first, second, third and fourth assignments of error are related and will be considered together. Plaintiffs argue that there were genuine issues of material fact to be tried in this case which would preclude summary judgment. In this regard, Civ.R. 56(C) provides that summary judgment should only be granted if reasonable minds can reach but one conclusion, and that conclusion is adverse to the nonmoving party. *Blankenship v. Enright* (1990), 67 Ohio App.3d 303, 305, 586 N.E.2d 1176, 1176. The party seeking summary judgment bears the initial responsibility of identifying those elements of the opponent's case which raise no genuine issues of material fact and upon which the moving party is entitled to judgment as a matter of law. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 526 N.E.2d 798, syllabus. Once the moving party satisfies this burden, the party opposing the motion has an affirmative duty to produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of the syllabus, citing *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. When reviewing a summary judgment, we apply the same standard as that employed by the trial court. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198, 199. Construing the evidence most strongly in favor of the nonmoving party, summary judgment will be granted where that party fails to make a showing sufficient to establish the existence of an element essential to that party's case and upon which it will bear the burden of production at trial. *Celotex, supra,* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273.

■ As this court recently noted in *Hedrick v. Columbus* (Mar. 30, 1993), Franklin App. No. 92AP–1030, unreported, 1993 WL 104713:

" * * * R.C. Chapter 2744, Ohio's Political Subdivision Tort Liability Act, * * * was enacted in 1985. This measure was passed in response to the judicial abrogation of sovereign immunity in Ohio in the early 1980's and creates its own framework for analysis of political subdivision liability. See *Blankenship v. Enright* (1990), 67 Ohio App.3d 303, 305–311 [586 N.E.2d 1176, 1176–1180]."

Here, the trial court's analysis of defendants' liability was indeed confined to the parameters set by R.C. Chapter 2744. As the trial court noted, the general principle embodied in this chapter of the Revised Code is that sovereign immunity blankets the actions of local government bodies and their employees from the threat of legal liability. R.C. 2744.02(A) provides that a political subdivision is not liable in damages in a civil action for injury, death, or loss

allegedly caused by an act or omission of the political subdivision. The express exceptions to this rule, subject to the dictates of R.C. 2744.03 and 2744.05, are enumerated in R.C. 2744.02(B). Plaintiffs first assert that R.C. 2744.02(B)(2) and (B)(5) provide exceptions to immunity under the present set of facts.

R.C. 2744.02(B)(2) provides:

*"Political subdivisions are liable for* injury, death, or loss to persons or property caused by *the negligent performance of acts* by their employees *with respect to proprietary functions of the political subdivision."* (Emphasis added.)

The term "proprietary function" is defined in R.C. 2744.01(G)(1) as:

" * * * [A] function of a political subdivision that is specified in division (G)(2) of this section or that satisfies both of the following:

"(a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section;

"(b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons."

By contrast, the term "governmental function" is defined in R.C. 2744.01(C)(1) as:

" * * * [A] function of a political subdivision that is specified in division (C)(2) of this section or that satisfies any of the following:

" * * *

"(b) A function that is for the common good of all citizens of the state;

"(c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function."

■ Though R.C. 2744.01(C)(2)(*o*) specifically designates as an immune governmental function the "operation of * * * children's homes and agencies," plaintiffs nonetheless argue that the fishing outing in question was part of the proprietary functions of the agency within the meaning of the immunity section in R.C. 2744.02(B)(2). Simply put, plaintiffs maintain that such a trip was not essential to the operation of the agency or its purposes and, therefore, the outing cannot be said to fall within the agency's immune operations. We disagree because under R.C. 5153.16(O)(1)(c), child care facilities are evaluated yearly by the state to ensure that the children there receive "adequate recreational opportunities" as part of their care. We cannot say that a fishing trip is so far out of the range of "adequate" recreational opportunities and the discretion of the

agency in this regard that the agency's action here could be characterized as nongovernmental. Perhaps if the agency deviated altogether from anything that a reasonable custodian would choose as an activity, like taking the boys skydiving or bungee jumping, thereby creating an inherent and substantial risk of harm without any countervailing benefits, we would rule otherwise. However, in this case, the type of activity chosen for these boys appears to be well within the sound discretion of the agency.

■ Plaintiffs next contend that, even if the activity in question is characterized as a governmental function, defendants are nevertheless liable because other sections of the Revised Code impose liability on them. On this score, R.C. 2744.02(B)(5) states that an exception to immunity exists where "liability is expressly imposed upon the political subdivision by a section of the Revised Code. * * * "

■ To establish such liability, plaintiffs cite the definition of legal custody contained in R.C. 2151.011(B)(10), the prohibition against criminal child endangerment contained in R.C. 2919.22, and the wrongful death statute codified at R.C. 2125.01 *et seq.* However, none of these statutes *expressly* imposes liability upon defendants for the harms alleged by plaintiffs. As the appellate court plainly held in *Farra v. Dayton* (1989), 62 Ohio App.3d 487, 576 N.E.2d 807, a court should give sections of the Revised Code their ordinary meaning and should not "stretch" them to impose liability on a political subdivision for purposes of the exception to immunity contained in 2744.02(B)(5). *Id.* at 496, 576 N.E.2d at 812–813.

■ Plaintiffs also maintain that, even if no express statutory provision imposes liability on defendants for their negligence in this instance, defendants nonetheless have a "special relationship" with children in their care, allowing for common-law liability under the decision of *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468. But as we recognized in *Hedrick,* the passage of R.C. Chapter 2744 abrogated the public duty/special duty theory of municipal liability. *Hedrick, supra; Amborski v. Toledo* (1990), 67 Ohio App.3d 47, 51, 585 N.E.2d 974, 976. Consequently, the decision of *Crago v. Lorain Cty. Commrs.* (1990), 69 Ohio App.3d 24, 590 N.E.2d 15, which appeared to employ the similar "special relationship" reasoning of *Brodie v. Summit Cty. Children Serv. Bd.* (1990), 51 Ohio St.3d 112, 554 N.E.2d 1301, cannot control.

■ Plaintiffs lastly contend that, even if defendants cannot be held liable for their negligence, R.C. Chapter 2744 does not absolve either the agency or its employee from liability for reckless behavior. Plaintiffs contend that reasonable minds could conclude that defendants were reckless on the record presented. We cannot agree.

In *Jackson v. Butler Cty. Bd. of Commrs.* (1991), 76 Ohio App.3d 448, 602 N.E.2d 363, the appellate court examined whether a social worker and board of county commissioners could be held liable for the death of a child in the custody of the county's human services department where the child was placed by the social worker in the custody of her natural father, who had previously abused and neglected the child and eventually beat the child to death. The complaint in the consequent wrongful death action against the social worker and the county board of commissioners charged them with "negligent, willful, wanton and reckless conduct" for placing the child in the custody of her abusive natural father, and for failing to provide any protective supervision under the circumstances. After recognizing the general rule of immunity in R.C. 2744.02(A)(1) for political subdivisions in the exercise of their governmental or proprietary functions, the *Jackson* court noted that the operation of a county human services department is a governmental function, which would exempt the operation of the department from liability for simple negligence under R.C. 2744.02(B)(2). The court then analyzed the defendants' liability for wrongful death based on reckless performance of its duties, as follows:

"The political subdivision itself is immune from liability if the death or injury resulted from the exercise of judgment or discretion in determining how to use personnel and other resources, unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner. R.C. 2744.03(A)(5). Similarly, R.C. 2744.03(A)(6) provides that:

" 'In addition to any immunity or defense * * * the employee is immune from liability unless one of the following applies:

" '(a) His acts or omissions were manifestly outside the scope of his employment or official responsibilities;

" '(b) His acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

" '(c) Liability is expressly imposed upon the employee by a section of the Revised Code.' " *Id.,* 76 Ohio App.3d at 453, 602 N.E.2d at 366.

Even if a children services agency or its employee could be liable for reckless disregard of the safety of a child committed to its care, as the *Jackson* court intimated, we cannot conclude under the instant set of facts that there is a genuine issue of material fact concerning recklessness.

To define "reckless behavior," the *Jackson* court employed the test stated in *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 559 N.E.2d 705 (quoting 2 Restatement of the Law 2d, Torts [1965] at 587, Section 500). The *Jackson* court said that recklessness occurs if an actor " ' "does an act or intentionally fails to do an act which is his duty to the other to do, knowing or having reason to know of

facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." ' " *Jackson, supra,* 76 Ohio App.3d at 454, 602 N.E.2d at 367. Here, however, it cannot be said that either FCCS or Carol Hoversten–Pepper acted in reckless disregard of the rights of Mark Longstreth by taking him on a fishing outing to the Greenlawn Dam area. Plaintiffs simply failed to establish that defendants perceived a substantial risk to Mark Longstreth. His own uncontrollable individual actions in contravention of both the instructions of Hoversten–Pepper and the no-wading signs, assuming that he did see them, are simply too much to charge defendants with under the circumstances.

Plaintiffs' first, second, third, and fourth assignments of error are not well taken.

In their fifth assignment of error, plaintiffs argue that R.C. Chapter 2744 as construed and applied to the instant set of facts is unconstitutional under due process and equal protection principles. Plaintiffs claim that the state had no real or legitimate interest in limiting the remedies of the children it commits to juvenile facilities where they are supposed to be protected from harm in those facilities.

First, it must be noted that a person has no vested right in a rule of common law allowing liability in the place of sovereign immunity. The constitution does not forbid the creation of new or the abolition of old common-law rights. *Phipps v. Dayton* (1988), 57 Ohio App.3d 11, 566 N.E.2d 181. As noted in *Agee v. Butler Cty.* (1991), 72 Ohio App.3d 481, 594 N.E.2d 1050, when the state consents to be sued, it may qualify and draw parameters around that granted right without violating due process or equal protection. *Id.* at 484, 594 N.E.2d at 1051, quoting *Grange Mut. Cas. Co. v. Columbus* (1989), 49 Ohio App.3d 50, 550 N.E.2d 524. When neither a fundamental right nor a suspect classification is implicated, a rational basis test is used to test the statutory classification against the articulated legitimate state interest. *Id.* Here, the political subdivision had a legitimate interest in limiting its liability to appropriate and manageable boundaries. It could have rationally concluded that unbridled liability stemming from the operation of children's homes and agencies would cripple the ability of the political subdivision to provide the needed services to the children the agency was charged to protect. Plaintiffs did not establish any record to the contrary. Accordingly, we do not find that the Constitution was violated in this instance and, thus, plaintiffs' fifth assignment of error is not well taken.

Wherefore, plaintiffs' assignments of error are overruled. The judgment of the trial court is affirmed.

*Judgment affirmed.*

BOWMAN and JOHN C. YOUNG, JJ., concur.